**UNITED STATES of America**

v.

**Mark KURLAND, Defendant.**

**No. 10 Cr. 69(VM).**

United States District Court, S.D. New York.

May 26, 2010.

Jonathan R. Streeter, U.S. Attorney's Office, New York, NY, Andrew Zenner Michaelson, Boies, Schiller & Flexner LLP, Fort Lauderdale, FL, for Plaintiff.

Lawrence Iason, Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., Jeffrey David Rotenberg, Patrick J. Smith, Theodore Theodore, DLA Piper U.S. LLP, New York, NY, for Defendant.

### DECISION AND ORDER

VICTOR MARRERO, District Judge.

On January 27, 2010, defendant Mark Kurland ("Kurland") pled guilty to one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and one count of securities fraud in violation of 15 U.S.C. §§ 78j(b) & 78(ff). Prior to sentencing, Kurland moved that

(1) the Court grant his request for a two-level reduction pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 3B1.2(b) ("§ 3B1.2(b)") on the grounds that he was a minor participant in the offense conduct;

(2) the Court grant his request for a downward departure pursuant to U.S.S.G. § 5H1.4 (" § 5H1.4") on the grounds that he has an extraordinary physical impairment; and

(3) in weighing the factors listed in 18 U.S.C. § 3553(a) ("§ 3553(a)"), the Court favorably consider, among other things: his history of charitable giving, health concerns, and the needs of his family; that many similarly situated defendants received noncustodial sentences; that a de-

fendant in this case has entered into a plea agreement providing for a U.S.S.G. range of imprisonment of zero to six months; and that he is substantially less culpable than the average insider trading defendant.

At Kurland's sentencing before the Court on May 21, 2010, as further elaborated upon in the Statement of the Court which is attached hereto and incorporated herein, the Court denied Kurland's motion for a minor participant reduction pursuant to § 3B1.2(b) and for a downward departure pursuant to § 5H1.4. However, the Court weighed Kurland's age and health, support from family and friends, and history of good works and involvement in various charities in its consideration of the factors under § 3553(a)(1).

The Court concluded that, under the U.S.S.G., Kurland's total adjusted offense level for the two counts on which he pled guilty is nineteen (19) and his criminal history category is I. Upon consideration of the factors listed in § 3553(a), the Court sentenced Kurland to serve a term of incarceration of twenty-seven (27) months on each of the counts, to be served concurrently, to be followed by two (2) years of supervised release. Kurland was also ordered to forfeit to the Government a sum of $900,000, representing the proceeds derived from the offense.

**SO ORDERED.**

## STATEMENT BY THE COURT REGARDING DEFENDANT'S SENTENCE

Mr. Kurland seeks the Court's leniency and requests a noncustodial sentence. Mr. Kurland argues that he qualifies as a minor participant in the offense conduct under Guidelines section 361.2(B), warranting a two-level downward adjustment in his offense conduct. Mr. Kurland believes that the "touchstones" of insider trading are absent from his case, that his cocon-

spirators are significantly more culpable, and that generally, the conduct of defendants in related insider trading cases is more serious than his conduct in this case.

■ Mr. Kurland minimizes the significance of his role in the offense. As general partner and senior managing director of New Castle, he advised several hedge funds that were valued together at approximately one billion dollars. In this role as manager, Mr. Kurland supervised at least one of his coconspirators. In other words, Mr. Kurland was the boss, and a person in a position of substantial power at his office and in the industry. The Court is not persuaded that a person with such high standing and such a significant role among his coconspirators can be characterized as a minor participant. This is not a case in which a low-level inside functionary by happenstance stumbled upon nonpublic information and proceeded to pass it on or trade upon it in a one-time transaction. On the contrary, Mr. Kurland played an active role in a complex, sophisticated scheme that he himself advanced and carried out over five months to fruition in substantial gains. He secretly listened in on phone conversations with a company executive to glean nonpublic information that he could use for the benefit of the hedge funds he managed. After the conversation, he specifically directed an employee coconspirator to ask the executive questions geared toward gaining even more nonpublic information. He then used this nonpublic information, and other nonpublic information gained over the course of many months, to buy and sell shares in three separate companies. Further, Mr. Kurland was aware, through his own participation and frequent updates from his coconspirator employee, of the vastness of the insider trading scheme in which he was involved. On the basis of these considerations, the Court agrees

with the Government that a two-level downward departure based on minor participant status is unwarranted.

■ The Court is also not persuaded that a downward departure based on "extraordinary physical impairment" is warranted pursuant to Guidelines section 5H1.4. While the Court is sympathetic to Mr. Kurland's health issues, including hyperlipidemia, diabetes mellitus, and prostate cancer (which is currently in remission), the standards for downward departure on medical grounds are rigorous. Mr. Kurland has not been hospitalized in years and his conditions are currently being treated by prescription medication, as indicated by his physician in a letter submitted to the Court, Moreover, as the Government points out, Mr. Kurland's medical conditions have not impeded him in any substantial way from remaining in full employment up to his arrest. Mr. Kurland is not afflicted with an extraordinary physical impairment that the Bureau of Prisons would have difficulty accommodating. As such, the Court declines to grant the departure.

■ In coming to its sentencing decision, the Court has considered Mr. Kurland's significant contributions to his family and to the larger community. The letters from friends, family, and associates paint a picture of the model citizen and family man; a man held in the highest regard by those around him. The Court particularly notes Mr. Kurland's involvement in his daughter's nonprofit organization, as well as his generous donations to St. Christopher's School for Kids and other charities. Today, Mr. Kurland's attorney reiterates the message conveyed by the letters: that Mr. Kurland is known for his commitment to philanthropy and the public good, kindness to friends, and devotion to family.

Unfortunately, however, Mr. Kurland's presentation to the Court, though stressing points that argue for uniqueness, distinction, and individual consideration, is in fact not uncommon in the world of white collar crime and has been made in this courtroom many times before. Mr. Kurland urges the Court to consider that he has already shown full rehabilitation and earned redemption; that there is absolutely no likelihood of recidivism and thus no threat of future harm to society; that no further need exists to punish him because he has been wracked long enough by shame, by ruin of his family and personal life, by loss of his primary means to earn a livelihood. Mr. Kurland argues that the purposes of sentencing have already been satisfied, that a sentence of incarceration would serve little or no useful purpose, and that probation would be enough.

■ Let me stress at this point that the Court is not unmindful or unsympathetic to these points. There is much in the Defendant's plea to commend the compassion it seeks to evoke. But the argument, compelling as it sounds on the surface, fails in essential ways. Fundamentally, it is flawed by what it omits. In particular it makes no account of several other circumstances courts are instructed to weigh adequately in ordering a fitting sentence: to reflect the severity of the crime; to promote general respect for the law; to avoid unwarranted sentencing disparities; and to consider the impact of the crime not only on its immediate victims, but on the larger social order. These principles are interrelated. They share vital links with some basic concepts, ideals emblematic of the law, profoundly significant for sentencing to ensure a right and just result for all concerned: fairness, balance, proportionality, and equality of treatment under law for relatively similar persons and circumstances. In sentencing, these principles

seek to ensure that judgments overall fairly align so as to achieve, like bodies in orbit, a special form of equilibrium, a proper balance in the delicate symmetry of justice.

In that regard, Mr. Kurland has requested that the Court compare him to eleven recent insider trading defendants who received sentences below the Guidelines range. The Court has reviewed the circumstances relevant to those sentences, and finds that they are each distinguishable from the instant situation in significant respects. Although the Court will not review all of those cases today, an example may serve to illustrate what sets apart the facts presented here from those cases cited by Mr. Kurland. Mr. Kurland points to *United States v. Holzer*, in which this Court sentenced Mr. Holzer to five years of probation and 270 days in a residential reentry center for one count of securities fraud and one count of conspiracy to commit securities fraud. Mr. Holzer received nonpublic information and traded on this information in his own name and his relatives' names. Mr. Holzer made over $100,000 in illegal gains.

Contrary to Mr. Kurland's suggestions, the contrast with Mr. Holzer's offense actually reinforces the far greater seriousness of the scheme at issue here. Mr. Holzer, unlike Mr. Kurland, did not have over a billion dollars of assets under his control. He was an attorney—not a financial market professional—who received nonpublic information and used it for his own personal gain in what was a relatively small scale fraud. Mr. Kurland argues that he is less culpable than Mr. Holzer because his illegal gains were not personal. Considering Mr. Kurland's performance fee and personal investment in New Castle, the Court disputes the accuracy of that claim. But even setting personal profits aside, the Court remains nonetheless unpersuaded by Mr. Kurland's comparisons.

According to Mr. Kurland, the net result of the trades at issue was a loss of $4.8 million, which means, in his view, that there was no real harm done to the market. Mr. Kurland argues that gross gains are a poor measure of culpability because he was "running a billion dollars" and that "any trade that was 'typical' for a fund this large would potentially generate gains that would be outsized by Guidelines standards." That, in the Court's view, is precisely why Mr. Kurland is that much more culpable than the "typical" investor trading on inside information.

In the context of securities fraud, the whole range of harm caused cannot be measured solely by the defendant's net losses or gains. By centering entirely on effects on him, Mr. Kurland's calculus of injury improperly discounts material harm his offense caused to larger societal interests. Mr. Kurland's actions, stemming from a recognized leader of the industry, compromised the financial market's integrity at a time of financial crises and widespread concern about corruption, rampant recklessness, and arrogant greed at the highest levels of the industry, a culture of oblivion to the meaning of reasonable limits that contributed significantly to bring about the worst economic collapse in the country since the Great Depression. As has emerged from various public investigations of the aftermath, those practices played a role in the disintegration or bankruptcy of some of the most venerable financial institutions and required government rescue efforts at a cost of hundreds of billions of public dollars.

It is this Court's view of matters now common knowledge, that to some extent this country's financial meltdown was fueled precisely by the attitudes manifest by Mr. Kurland in this proceeding, and repeated by defendants in other related cases. These offenders express a view

that forms a pattern: They minimize their conduct, they suggest that their roles were really minor, that the gains they made were relatively small, that others are more to blame for more culpable offenses, that the markets were not really hurt, so that the offenses charged essentially amount to victimless crimes.

These rationalizations are beside the point. Fundamentally they suggest a perception that the law applies only to the other guy, and that what are self-servingly dismissed as minor infractions have no cumulative impact on the larger community, or indeed on the nation as a whole. This view, if not effectively curtailed, can quickly deteriorate to a philosophy in which moral bounds blur or disappear altogether, engendering a reality in which everything is permitted. The real point for Mr. Kurland here was that he had a choice. As a leader of the financial industry, he could have led by law abiding example. Instead, he chose to follow. He became a joiner, surrendering to the spree of the financial market's virtual mob mentality that nearly brought down this nation's economy in the quest for ever bigger and faster gains.

In sum, Mr. Kurland held a prominent position in the securities industry, with over twenty-five years of investing experience. Mr. Kurland worked his way into a position of great power and influence, and he abused that power. Contrary to his arguments, the Court does not view Mr. Kurland's offense as an atypical situation presenting circumstances that would require special leniency, but as an egregious example of insider trading by an individual in a position to play role model in the financial community—someone who, quite frankly, should have known better, and let down many people he should have led.

The Court has also considered that one of the tippers involved in this fraud, Robert Moffat, has entered into a plea agreement with the Government that provides for a Guidelines range of zero to six months' imprisonment, significantly less than Mr. Kurland. The Court notes, however, that Mr. Moffat was only one of Mr. Kurland's sources of information and that the information provided by Mr. Moffat was not the only insider information that Mr. Kurland traded upon as a part of his ongoing scheme. Mr. Moffat, though he breached his duty to his employer, did not provide information in exchange for money, and did not stand to make any monetary gains from his transgression. Most important, Mr. Moffat, unlike Mr. Kurland, was not a powerful player in the securities markets, with hundreds of millions of dollars to invest.

The Court gives significant weight here to the principle of general deterrence, and the importance of serious enforcement of the securities laws, particularly in cases such as this, where an individual with great influence in the securities field flouts the law. Mr. Kurland built his life off of the integrity of the stock markets, and it is this Court's view that he therefore had a special responsibility to safeguard the integrity of those markets, and to set an example: that insider trading is serious criminal behavior, and not simply an unwritten part of the job description.